J-A27042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: Z.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M., MOTHER | : : : : : : : | |
| | : | No. 942 MDA 2022 |

Appeal from the Decree Entered June 8, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  019-ADOPT-2022

BEFORE:   DUBOW, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED: FEBRUARY 7, 2023**

J.M. ("Mother") appeals from the June 8, 2022 decree entered by the Court of Common Pleas of Cumberland County Orphans' Court ("orphans' court"), which granted the petition filed by the Cumberland County Child and Youth Services (the "Agency"), terminating Mother's parental rights to her son, Z.M. ("Child"), born in August 2020, pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).[1, 2]  After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother also appeals the decision of the dependency court to change the placement goal from reunification to adoption.  That appeal is separately listed before this panel.  ***See*** 933 MDA 2022. We dismissed that appeal as moot based on our determination to affirm the termination of Mother's parental rights.

[2] The court also terminated the parental rights of the natural father, Z.H., and the legal father, M.M., each of whom met with an Agency caseworker while
*(Footnote Continued Next Page)*

We glean the relevant factual and procedural history from the orphans' court's August 3, 2022 opinion ("TCO") and the record. The Agency received a referral regarding Mother in July 2020, while Mother was pregnant with Child and Child's legal father was incarcerated, that she was mentally unstable and living in deplorable conditions. According to information the Agency received from Mother after Child's birth, Mother intended, after her husband was out of jail, to move Child from the home of a friend where she and Child were living to a camper on her father's property; however, the camper was sold in sheriff's sale in September 2020. An initial family service plan was established in September 2020, but in October 2020, Child was adjudicated dependent and placed in the physical custody of the legal father and under the protective supervision of the Agency following reports raising concerns for Mother's mental health and negligence in providing basic care for Child. *See* TCO at 2-3; Court Appointed Special Advocate Program ("CASA") Report, 6/6/22. The Agency removed Child from the custody of his legal father in May 2021 after Child sustained significant injuries consistent with non-accidental trauma while in his care. Child was placed in the foster home of his current foster parents, and by November 2021, Mother, who has epilepsy, was living with a new significant other, not working, and applying for disability; by January 2022, she was no longer living with that significant other and in March 2022,

---

incarcerated at Cumberland County prison and executed a voluntary consent to adoption form. See N.T. at 19. Neither the natural father nor the legal father has appealed from the termination of his parental rights.

she obtained independent housing that was deemed by the Agency to be inappropriate for Child.[3]  TCO at 4.

Contemporaneously with the filing of the termination petition, which occurred on March 23, 2022, Mother had begun living with her grandfather. A goal change and termination of parental rights hearing was held on June 8, 2022, at which Agency caseworkers, a clinical mental health counselor who had begun treating Mother, Child's foster mother, and Mother herself testified. *Id*. at 5.

Mother timely filed this appeal, and presents the following issues for our review:

> 1.      Whether the [t]rial [c]ourt erred as a matter of law and abuse[d] its discretion when it found, despite a lack of clear and convincing evidence that sufficient grounds existed for a termination of [Mother's] parental rights to [Child], thus contravening section 2511(a) of the Adoption Act, 23 Pa.C.S. § 2511(a).
>
> 2.      Whether the [t]rial [c]ourt erred as a matter of law and abused its discretion in terminating [Mother's] parental rights when the conditions which led to the removal or placement of [Child] no longer existed or were substantially eliminated, thus contravening sections 2511(a) and (b) of the Adoption Act, 23 Pa.C.S. § 2511(a), (b).

---

[3] As reported in a June 2022 CASA report, Mother was visited at this location on February 21, 2022.  The dwelling was described as a one-room efficiency with no kitchen, "located in the back part of the Carriage House Tavern which is now closed.  There was a large yard around the building that has a chemical container on the ground…The room itself was very small, just enough room for the bed and shelving."  CASA Report at 6.  Mother reported that she doesn't use the one cabinet in the bathroom because it is full of things from previous residents.  *Id*.  The Agency caseworker testified that the room is located in a building with known pedophiles and drug addicts.  N.T. at 46.

3.     Whether the [t]rial [c]ourt erred as a matter of law and abused its discretion determining the best interests of [Child] would be served by terminating parental rights when [Mother] was ready, willing, and able to parent [Child] and provide for his needs, thus contravening section 2511(b) of the Adoption Act, 23 Pa.C.S. § 2511(b).

Mother's Brief at 4 (suggested responses omitted).

Our standard of review in appeals from orders terminating parental rights is deferential:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (citation omitted).

The burden is upon the Agency as petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid.  *See In re R.N.J.*, 985 2d 273, 276 (Pa. Super. 2009).  The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  *Id*. (citation and internal quotation marks omitted).

Here, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(8) and (b), which provide as follows:

> (a)  General rule.--The rights of a parent in regard to a child may be terminated after a petition is filed on the following grounds:
>
> ---
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, and 12 months or more have elapsed since the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> ---
>
> (b)  Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(8), (b).  Under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights, focusing initially on the conduct of the parent; only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child.  *In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005).

To satisfy Section 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights

would best serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Unlike other subsections, Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child. *In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). "[T]he relevant inquiry" regarding the second prong of Section 2511(a)(8) "is whether the conditions that led to the removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the Section 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

Although Section 2511(a)(8) generally focuses on the behavior of the parent, the third prong of Section 2511(a)(8) specifically "accounts for the needs of the child." *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*). This Court has recognized that "the application of [Section 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

> However, by allowing for termination when the conditions that led to removal of the child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not

- 6 -

> subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id*.

Here, Child has been removed from Mother's care since September 2020 and the termination hearing took place in June 2022, well over the 12-month requirement set forth in Section 2511(a)(8). At the June 2022 hearing, the Agency's casework supervisor, who also acted as the direct caseworker for this case for a period of time due to staff shortages, testified that he had spent more time talking to Mother than to any other parent he has ever worked with, and that she was well-apprised of what steps she needed to be taking and what would occur if she failed to do so in a timely manner; nevertheless, he stated, her employment had been inconsistent and in the two and one-half months prior to the termination hearing, Mother had made just minimal progress toward her goals. N.T. at 60, 71. The Agency caseworker acknowledged that since March 15, 2022, one week before the termination petition was filed, Mother has been working virtually with an outpatient therapist at Laurel Life; however, Mother had refused to enter the inpatient or partial hospitalization program that had been recommended to her as part of her Family Assessment for Service and Treatment ("FAST") evaluation conducted by Alternative Behavior Consultants ("ABC"), which they deemed necessary in order for her to address her needs sufficiently. N.T. at 54; FAST Report, Exhibit 6 at 257-258.

The therapist from Laurel Life, a clinical mental health counselor, testified that for the past two and one-half months, he has worked with Mother to address her post-traumatic stress disorder, grief processing and instability in her relationships, but that during their virtual sessions, they did not discuss parenting skills. N.T. at 10. He stated that although Mother is engaged in sessions, she has further to go to address her therapy goals. N.T. at 15.

Mother completed the initial phase of Training for Improved Parenting Skills ("TIPS") recommended by ABC, but her skills assessment score continued to demonstrate a high level of risk due to the continuation of issues regarding inadequate housing, mental health issues and possible cognitive defects, *see* TIPS Final Report, 2/18/21, and due to the fact that she had only recently moved into her grandfather's trailer, she had not been able to begin the second phase of the TIPS skills program ("SKILLS"), which incorporates contact between the child and the parent in the home setting, until just prior to the termination hearing. *Id*. The Agency supervisor testified that the SKILLS program normally takes about six months, with an additional three months of reunification services. N.T. at 58.

Child's guardian *ad litem* ("GAL") filed a joint brief with the Agency, in which it was noted that Mother had obtained neither stable housing nor stable employment by the date the termination petition was filed, and even her newly-found housing with her grandfather included a potentially hostile neighbor with whom she had had prior altercations. Joint Brief of Agency and GAL at 16.

In finding the evidence sufficient under Section 2511(a)(8), the orphans' court reasoned that any long-term consistency in Mother's goals had yet to be seen, emphasizing that her efforts toward meeting her most pressing goals began "after or just days prior to the petition to termination being filed." TCO at 12. The court stated:

> [Mother] has not had appropriate or stable housing until either March or April of 2022 or full-time employment until April 2022 though [Child] had been removed from her care for a year and a half at that time. [Mother] declined early attempts to get her into the recommended mental health treatment and only obtained regular mental health counseling in mid-March, a week before the termination petition was filed, again a year and a half into [Child's] removal from her care.

*Id*. The orphans' court further reasoned that the goal to maintain the parent-child bond and improve parenting skills, "which by all accounts is linked to [Mother's] mental health," continued to give it concern and that it did not find this condition remedied in any significant measure. *Id*. In sum, the orphans' court found Mother not ready, willing, or able to parent Child, noting that projections for reunification, taking into account the period required for sustained consistency in her mental health treatment, housing, and the completion of the parenting skills program she had just begun, ranged from six to twelve months. *Id*. at 13.

Upon review, we find no abuse of discretion in the orphans' court's determination that the three components of Section 2511(a)(8) have been satisfied. Although Mother acknowledges that she has failed to meet her

parenting goals, she avers that she has met her housing, employment, and mental health goals, and she requests additional time to complete her parenting goals.[4]  Mother's Brief at 13-15.  We find, however, that the orphans' court's conclusions that the conditions that led to removal of Child from Mother one month following his birth continue to exist are supported by clear and convincing evidence and we will not disturb them on appeal.

We must turn then to subsection (b) of Section 2511, which requires the court to "give primary consideration to the development, physical and emotional needs and welfare of the child."  23 Pa.C.S. § 2511(b).  "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability."  **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (citation and quotation marks omitted).  Our Supreme Court has made clear that Section 2511(b) requires the orphans' court to consider the nature and status of the bond between a parent and child.  **In re E.M.**, 620 A.2d 481, 484-85 (Pa. 1993).  In addition to a consideration of a bond, if any, between a parent and child, the orphans' court may equally emphasize the safety needs of the child, and "should also consider

_____

[4] In her brief, Mother appears to challenge the orphans' court's inability to consider, as part of the Section 2511(a)(8) analysis, any of her efforts to remedy the conditions described in the termination petition which were first initiated subsequent to the giving of notice of the filing of the petition. **See** Mother's Brief at 17.  She asserts, for the first time, that the orphans' court failed to present evidence as to when she received notice that the termination petition had been filed, and presumably that she was not notified of its filing; this assertion is belied by the record, which includes her March 28, 2022 signed and dated acknowledgement of receipt of the notice of the hearing on the termination petition.  **See** Agency Exhibit 5 at 200.

the intangibles, such as the love, comfort, security and stability the child might have with the foster parent." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). Our Supreme Court has stated that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268.

The orphans' court heard the testimony of Child's foster care specialist, an employee of the Bair Foundation; she testified as to her monthly visits with Child at his foster home. N.T., 23-27. She reported that Child's foster family is interested in adopting him, and stated that Child is doing well, and is receiving occupational therapy for balance and strength three times a month as well as monthly physical therapy. *Id*. at 24, 27. Child's foster mother also testified. She stated that Child is a part of their family, gets along well with the couple's three-year old boy, and that she and her husband both love Child and consider him to be their son. *Id*. at 30, 32. The foster family lives on a farm, and Child loves animals and loves to play outdoors and participate in family outings. *Id*. She testified that Child is starting to become vocal, and calls her "Mom." *Id*. at 31. Child's foster mother also testified that Child refuses to go to the Agency supervisor during Mother's visits with Child, and does not look forward to visits with his Mother; she reported that after visits with Mother, Child is usually "confused and upset, angry, mad" and needs to be snuggled and calmed down. *Id.* at 33, 36.

- 11 -

The orphans' court found that Child, who has spent all but the first month of his life outside of Mother's custody, is clearly bonded most primarily with his foster family. TCO at 15. The court explained:

There are cases where a Child is bonded both to the biological parent or parents and his foster family, and we look to the totality of the circumstances to determine what detriment the Child might suffer if a parent's rights are terminated or, for example, if the bond with the foster parents is strong enough to carry the Child through a period of the biological parent's bond being tested or broken. Due to the [Child] spending only the first month of his life with [Mother], his young age, and his understanding that the foster family is his family, this is not such a case. We are confident that [Mother] loves [Child], just as we are confident that [Child] enjoys visits with [Mother] once they settle into a groove, but we are persuaded by voluminous testimony that [Child] considers his foster parents to be his parents, that he has difficulty at the start of visits tearing away from the foster parent, and that he has difficulty after visits at which point he requires significant attention to re-transition.

We also reiterate our concern with reports in the ABC visit summary that [Mother] has allowed her agitation with ABC to affect her interactions with [Child], including abruptly pulling items away from him when the supervisor attempted to redirect her, which is indicative to us of [Mother's] lack of focus on her relationship with [Child] and the need for a significant amount of additional time to show consistent parenting skills and mental health stability. The [guardian] ad litem pointed to the Child's "very strong bond" with his foster family to recommend termination. We are persuaded of this sentiment.

TCO at 15. The orphans' court also noted its agreement with the Agency caseworker who testified that the greatest detriment would result from pulling Child away from the only family he has ever known given Child's young age, the brief time he has spent in Mother's care, and the strength of his bond with

his foster parents, especially since an additional six months to a year would be required in order to re-examine reunification with Mother. *Id*. at 16.

In sum, the record reflects that the orphans' court appropriately considered the effect of the termination of Mother's parental rights to Child pursuant to Section 2511(b), and did not abuse its discretion or commit an error of law in determining that termination of Mother's rights is in Child's best interest. Based on the foregoing, we affirm the decree involuntarily terminating Mother's parental rights to Child pursuant to Sections 2511(a)(8) and (b).

Termination decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/07/2023